**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 7 |
| PROJECT VERTE INC., | Case No. 23-10101-LSS |
| Debtor. | |
| ALFRED T. GIULIANO,<br>as Trustee for Project Verte Inc., | Adv. Proc. No. _____ |
| Plaintiff, | |
| v. | |
| JULIAN KAHLON and<br>GRAHAM FORTGANG, | |
| Defendants. | |

**COMPLAINT**

Plaintiff Alfred T. Giuliano (the "Plaintiff" or "Trustee"), by and through his undersigned counsel, brings this complaint on behalf of Project Verte Inc. ("Project Verte" or the "Company") against Julian Kahlon and Graham Fortgang (collectively, the "Defendants"), former directors on Project Verte's board of directors (the "Board"), seeking to recover damages for Defendants' breaches of the fiduciary duties of good faith and loyalty they owed Project Verte. Plaintiff's allegations are based upon information and belief, and upon an investigation into the Defendants' acts and omissions, which included reviewing minutes of Project Verte's Board meetings, emails involving the Defendants, and other Company records.

**PRELIMINARY STATEMENT**

1.      This is a case about two directors who acted against their Company's interests by refusing to approve a value-maximizing sale of assets that the Company needed to survive.

2.      Before filing for bankruptcy on January 26, 2023 (the "Petition Date"), Project Verte operated as a full-circle e-commerce platform that used automated fulfillment centers, proprietary software, and blockchain technology to service its customers. It had two primary lines of business: a fulfillment business and a software services business.

3.      After burning through more than $50,000 a day and incurring over $115 million in liabilities, however, Project Verte was faced with a severe liquidity crunch. To remain operational, Project Verte had to secure additional funding, but had no real prospects for sources of this funding.

4.      Defendants were aware of Project Verte's dire financial condition as they were provided extensive financial documentation promptly upon joining the Board. Defendants also heard presentations from management on Project Verte's finances at numerous Board meetings.

5.      Project Verte's lack of funding was not a new problem. Indeed, Project Verte had engaged in a nearly two-year search process for new capital before filing for bankruptcy. For example, in April 2021, Project Verte engaged G2 Capital Advisors ("G2") to identify and secure potential debt or equity funders. G2 conducted a thorough search, reaching out to more than 230 potential investors and lenders. G2 employees even personally reached out to friends and family about Project Verte. In the end, no viable investors emerged, and although two lenders offered loans, the lender that Project Verte eventually selected withdrew at the last minute.

6.      Without a loan or equity investment, Project Verte was left with no choice but to pursue a sale of the fulfillment business. To that end, on April 27, 2022, it engaged Jim Tompkins of Tompkins Ventures ("Tompkins"), a 40-year veteran of the logistics industry and an international authority on designing and implementing end-to-end supply chains with extensive contacts, to market Project Verte's fulfillment business for sale. Tompkins compiled an offering memorandum over 60-pages long for prospective buyers and reached out to 143 unique buyers.

Senior leadership at Project Verte reached out to potential buyers as well, bringing the number of solicitations to more than 160 parties. The Company eventually received its best offer for the fulfillment business from GPA Logistics ("GPA") for a purchase price of $6 million.

7.      Defendants, however, made up half the Board, and they voted against the sale. They did so despite knowing the Company's lack of any other realistic option to continue as a going concern.

8.      At a Board meeting on July 20, 2022, Defendant Fortgang agreed the Company was in crisis. However, he said he thought there was nothing that could be produced that would change his mind, that his vote was a firm "no," and that no one should be asked to reconsider.

9.      Similarly, at a Board meeting six days later, Defendant Kahlon said, "nothing you add, nothing you say, nothing you'll do will impact my decision."

10.     At that July 26, 2022 meeting, Defendants were told GPA was concerned because Project Verte had not responded to its offer. However, Defendants still refused to approve the sale.

11.     GPA eventually withdrew its offer and Project Verte never realized the potential proceeds from the sale because of the Defendants' refusal to sell.

12.     At bottom, Defendants knew the Company needed a strategic transaction to bring in capital. They knew selling the fulfillment business would achieve that goal. They knew that no other realistic options existed. Yet, they intentionally acted against the Company's interests in refusing to approve the sale—demonstrating bad faith, a conscious disregard of their duties, and a refusal to act in the face of a known duty to do what was best for the Company, its shareholders, and its creditors. By refusing to sell, Defendants denied the Company the chance at survival, breaching the fiduciary duties of good faith and loyalty they owed to Project Verte.

## PARTIES

13.     Defendant Julian Kahlon was Project Verte's CEO from September 1, 2018 to March 5, 2020 and was a director of the Company two different times: once from July 21, 2019 through January 30, 2020, then again from April 1, 2022 until January 2023.

14.     Defendant Graham Fortgang was a director of Project Verte from April 7, 2022 to July 30, 2022.

15.     Plaintiff Alfred T. Giuliano is the Chapter 7 Trustee for the debtor, Project Verte.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 157 and 1334. Plaintiff consents to the entry of a final order by this Court.

17.     This Court has jurisdiction over Defendants because they have sufficient minimum contacts with Delaware so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper pursuant to 28 U.S.C. § 1409.

## BACKGROUND

### Project Verte Needed Funding

19.     Project Verte was a closely held corporation. Its stockholders were its initial investors—agreeing in September 2017 to provide the Company with lines of credit through 2019.

20.     That initial funding was necessary because, throughout the life of those lines of credit, Project Verte's losses significantly exceeded its revenue.

21.     This lack of cash flow remained true even as the credit line agreements expired in 2019, when Project Verte had $78,790 in revenue and losses of $24.5 million.

22.     However, over the next two years, Project Verte's revenue grew and its losses decreased overall.

23.     In 2020, revenue increased to $1 million and losses were $27.6 million.

24.     In 2021, revenue again increased to $5 million and losses were down to $23 million.

25.     That growth was encouraging, but still insufficient to achieve profitability.

**The Prospective Lender Withdrew**

26.     As the credit line agreements had expired, Project Verte needed a new source of funding.

27.     To find that funding, Project Verte engaged G2 on April 21, 2021.

28.     G2 is "an integrated multi-product, sector-focused boutique investment bank" that "focuses on industries where [its] C-level operating partners have deep industry knowledge and expertise" and specializes in, among other sectors, the logistics and supply chain industries. (https://www.linkedin.com/company/g2-capital-advisors/).

29.      To help Project Verte find funding, G2 reached out to over 230 potential debt and equity sponsors. G2's own employees even personally reached out to friends and family about Project Verte.

30.     After six months of marketing, only two parties offered term sheets for loans. Project Verte approved one of those loans, which would have provided up to $15 million in capital.

31.     However, in January 2022, that lender declined to fund the loan.

32.     By February 2022, Project Verte was operating at a loss of $2.4 million per month. With the lender withdrawing, the Company was forced to consider an alternative transaction.

**The Board Voted Unanimously to Sell the Fulfillment Business**

33.     In March 2022, Project Verte's Board consisted of four individuals: (1) Jane Gol, a director and stockholder appointed by the AJ Group—one of Project Verte's shareholders; (2) Yafit Lev-Aretz, whom Defendant Kahlon has described as an independent director; (3) Shelly Boniel, a director appointed by TNJ Holdings—another one of Project Verte's shareholders; and (4) Rea Mihaic, a director appointed by TNJ Holdings.

34.     At a Board meeting on March 2, 2022, the Board discussed the Company's continuing losses and lack of funding. During the meeting, senior management recommended marketing the fulfillment business for sale as soon as possible.

35.     On March 9, 2022, the Board met again. Bob Klunk, Project Verte's Chief Operations Officer ("COO"), informed the Board that the Company's losses were escalating daily and becoming unsustainable. Senior leadership then presented a plan to market and sell the fulfillment business and gave the Board a sample sales pitch.

36.     The next day, on March 10, 2022, the Board met again. The Board minutes from that meeting reflect that the Board voted unanimously to market and sell the fulfillment business as soon as possible.

37.     Less than two weeks later, however, on March 22, 2022, Ms. Boniel resigned from the Board. Shortly after, TNJ Holdings appointed her son, Adam Boniel, as her replacement.

38.     However, Mr. Boniel only spent two days on the Board—resigning on March 24, 2022.

**Defendants Joined the Board and Were
Informed About the Company's Dire Financial Condition**

39.     On April 1, 2022, Defendant Kahlon was appointed to the Board by TNJ Holdings to replace Mr. Boniel.

40.     On April 7, 2022, Defendant Fortgang was appointed to the Board as the other TNJ director, replacing Ms. Mihaic.

41.     Defendants had worked together for two years relating to a different company prior to joining Project Verte's Board.

42.     On April 26, 2022, Sara Rubenstein, Project Verte's Corporate Secretary, emailed Defendants 28 different documents, including documents about the Company's financial condition, Board minutes, and other Company records to help them understand the situation as new Board members. Ms. Rubenstein categorized those documents in eight groups:

- "1. Financials from January 2022

- 2. Accounts payable- as of March 18, 2022

- 3. Financials from 2018-2021

- 4. Verte Deck for customers/investors

- 5. Convertible Note Term Sheet- 3.17.22 (for discussion of continued funding of Project Verte by the shareholders)

- 6. Bank statements- as of March 18, 2022

- 7. The Board Meeting Minutes from 1/18/21-6/23/21 (there are so many that they will not all attach to this email, so I will send a second email with the rest)

- 8. Draft Financials from February 2022."

43.     Ms. Rubenstein then sent 18 additional sets of Board minutes from meetings held June 28, 2021 through March 24, 2022 in a follow-up email to Defendants.

**Shortly Thereafter, the Marketing Process for a Sale of the Fulfillment Business Began**

44.     May 2, 2022 was the first Board meeting after Defendants joined.

45.     At that meeting, Mr. Klunk, Project Verte's COO, updated the Board on the Company's efforts to sell the fulfillment business—including that, effective April 27, 2022, Project Verte had engaged Tompkins Ventures to market the fulfillment business for sale.

46.     Jim Tompkins, who led Tompkins Ventures, had extensive qualifications and experience enabling him to market the fulfillment business:

- He was a 40-year veteran of the logistics industry;

- He was an international authority on designing and implementing end-to-end supply chains;

- He was a serial entrepreneur who started several businesses, worked with private equity, designed many industrial facilities and automated materials handling systems, implemented many supply chain information technology solutions, and worked to enhance the performance of many third-party logistics companies and their clients;

- His 40+ years as CEO of Tompkins International gave him an insider's view of operators and third-party logistics companies; and

- As a direct result of that experience, he was extremely well connected across the supply chain industry, especially with contacts who were Project Verte's target market for prospective buyers.

47.     Tompkins himself came to see how Project Verte's fulfillment business operated, bringing three team members to the Company's warehouse and compiling a memorandum on the asset sale that was over 60-pages long.

48.     Before engaging Tompkins, Project Verte management had performed its own due diligence in identifying the best person or entity to market the sale of the fulfillment business. Management had contacted other advisors, including reaching out to G2 again, this time about marketing the fulfillment business for sale. All prospective professionals declined the engagement because Project Verte was operating at a loss; Tompkins, however, was willing to take the engagement on an exclusive basis.

### **Defendants Did Not Show Up to the Next Board Meeting**

49.    The Board's next meeting was on May 25, 2022.

50.    Ms. Rubenstein had emailed all Board members notice of the May 25, 2022 meeting on May 16, 2022.

51.    However, on May 25, 2022, Defendants were not present at the start of the meeting, and despite 17 minutes of emailing, calling, and leaving messages for Defendants, neither of them joined.

52.    Their absence meant no quorum was present, so the meeting was adjourned.

### **Defendants Were Told Time Was of the Essence in Selling the Fulfillment Business**

53.    On May 26, 2022, the Board met and the Defendants were present.

54.    Stephen Bullard, the Company's Executive Vice President of Operations, advised the Board that "time [was] of the essence for the sale" because buyers needed to be fully operational for the fourth quarter peak earnings season.

55.    Mr. Bullard advised the Board that there was "tremendous pressure for fulfillment space across the country, and the Company's facility in Atlanta [was] a turn-key, omnichannel operation."

56.    Mr. Bullard also stated that Tompkins had sent 190 teasers at this point and had received nine responses from companies that signed NDAs, some of which scheduled site visits and were interested in Project Verte's automated fulfillment equipment and robotics.

57.    Mr. Bullard stated that the Company itself had "very aggressively reached out to other prospective buyers," six of which were actively engaged in due diligence, such as visiting the site and reviewing Company information.

58.     Mr. Bullard advised the Board that Tompkins' advice was not to establish a sale price on the fulfillment business and that the first offer would be the best indication of value.

59.     According to Tompkins, this was because establishing a value would be difficult as selling the fulfillment business would not be an "Earnings Before Interest, Taxes, Depreciation, and Amortization" ("EBITDA") sale. That is, Project Verte was operating cashflow-negative, and the price would therefore depend on how each potential buyer strategically valued the fulfillment business.

### No Sale Had Been Achieved by Late June

60.     One month passed, and the Board had its next meeting on June 29, 2022. The Defendants were present.

61.     The Board minutes from that meeting reflect that Milton Barbarosh, Project Verte's Chief Financial Officer ("CFO"), sent financials to the Defendants and the rest of the Board for their review.

62.     Mr. Barbarosh noted that the Board had voted to sell the fulfillment business as soon as possible, and that the Company was in "dire straits and need[ed] funding to be able to continue" until it sold the fulfillment business.

63.     Mr. Klunk, the COO, also attended this meeting, and explained how the lack of funding was affecting the Company's ability to operate. He noted that market studies showed that a $2/hour rate increase above what Project Verte was paying laborers was needed to hire competitively. Mr. Klunk pointed to the Company's two largest competitors who were paying that increased rate. Indeed, he stated that, despite recently hiring 60 workers to help operate the fulfillment business, only 18 had stayed more than a few days.

64.     Mr. Klunk explained the Company's efforts to secure adequate labor—including gifts of $10 Chick-fil-A gift cards and increasing hourly rates.

65.     Mr. Klunk asked Defendants and the rest of the Board if they had questions. Defendants had none.

66.     Regarding the fulfillment sale, Mr. Bullard stated that, at this point, Tompkins had sent out 276 teasers to 143 unique buyers and that 21 interested parties executed NDAs. The Project Verte data room and Tompkins' 60-page memorandum were provided to these potential buyers. Two prospective purchasers went as far as conducting site visits.

67.     Defendants were also informed that senior management had reached out to an additional 15 companies—two of which also visited the site.

### Project Verte Finally Received Offers for the Fulfillment Business

68.     At the same Board meeting on June 29, 2022, Mr. Bullard informed Defendants and the rest of the Board that Project Verte had received two offers for the fulfillment business.

69.     The first was a verbal offer for between $6-8 million that, according to Mr. Bullard, was riddled with "deal killer[ ]" conditions. For example, the offeror required additional negotiations for new contracts with Project Verte's three biggest customers before closing—which, in Mr. Bullard's professional opinion, did not meet the Board's objectives of selling the fulfillment business as a cash deal by the end of July.

70.     The second was a formal offer, in writing, for $4.65 million from GPA, which would close by August 1, 2022.

71.     The Board minutes reflect that GPA's offer was "almost exactly what [Project Verte] asked for in terms of expectations and timing and what the Company was looking for."

GPA offered to buy all the equipment and assets used in the fulfillment business, including customer contracts, the warehouse lease, and equipment leases.

72.     GPA even agreed to allow the warehouse to be used as a showroom for Project Verte's proprietary technology, which would remain the exclusive property of Project Verte.

73.     Mr. Klunk added that GPA was a "very competent operator" who "really under[stood] the Company's fulfillment business."

74.     In short, GPA was a ready, willing, and able buyer for the fulfillment business.

75.     In contrast to GPA's offer, Mr. Klunk stated the first offer had "so many contingencies that it is not really an offer" and "is not attractive at all."

76.     Mr. Bullard noted that GPA had spent three days in the warehouse and that he was personally in daily contact with both co-founders of GPA regarding the sale.

77.     Mr. Bullard also stated that GPA's investment team had told Project Verte that they already approved of this acquisition and agreed they could close within Project Verte's timeline.

78.     Ms. Gol asked if Tompkins had insight on the offer with the contingencies. In response, Mr. Bullard answered that Tompkins advised that the first offeror would likely have to wait until fall 2022—at the earliest—before it could make a firm offer given the need to negotiate new contracts with certain of the Company's customers. The contingencies demanded by the offeror made it not a viable offer for Project Verte.

79.     Ms. Gol then asked if there were other potential buyers that Tompkins indicated may make an offer.

80.     In response, Mr. Bullard identified one, but said he did not think they had financing in place to make a cash offer within the Company's timeline.

81.     Indeed, that potential buyer never made an offer for the fulfillment business.

82.    Mr. Bullard concluded his presentation by stating that GPA's offer was the "overwhelming favorite, even given other offers that may still be made" because timing and the Company's burn rate needed to be factored in.

83.    At the end of the meeting, Defendant Fortgang asked Mr. Bullard to clarify what he meant by GPA's offer aligning with the Company's expectations.

84.    Mr. Bullard replied that he meant "the offer was for the purchase of the assets that the Company want[ed] to sell, and the timing for closing [was] within the Company's desired timing for the sale."

85.    Defendant Fortgang asked for Tompkins' offering memorandum sent to potential buyers and Mr. Bullard and Ms. Rubenstein circulated that to him and the rest of the Board.

86.    At the meeting, Defendant Fortgang said he understood the focus was on selling the fulfillment business before deciding strategies for the technology business.

### July Arrived and GPA's Final Offer of $6 Million Was Presented to the Board

87.    On July 18, 2022, the Board had another meeting. Defendants were present.

88.    At the meeting, the Board was notified that GPA's offer had increased to $6 million.

89.    GPA's complete offer was circulated to Defendants and the rest of the Board for review and the final GPA term sheet was presented to them for approval.

90.    At the meeting, Ms. Gol stated that GPA indicated it would hire Project Verte's fulfillment employees and take over the contracts with existing customers.

91.    Mr. Bullard stated GPA's offer was significantly better than the terms of the alternative verbal offer, which still included all the contingencies and no final price.

92.    Ms. Gol thanked Mr. Bullard and asked if anyone had questions. No one did.

93.     Mr. Barbarosh, the CFO, then presented on the financial state of the Company, including telling Defendants and the rest of the Board that Project Verte had total liabilities of over $115 million.

94.     Ms. Gol thanked Mr. Barabrosh and asked if anyone had questions. No one did.

**Defendant Fortgang Was Told Why Other Advisors Were Not Involved**

95.     At the July 18, 2022 meeting, Defendant Fortgang stated that, "of course a lot of people have looked at the [fulfillment] business," but he said he wanted the Company to reach out to other professionals other than Tompkins to market the fulfillment business, saying, "[i]f this means the difference of a couple million dollars [from another potential buyer], that might be game changing because [GPA's] offer is not enough to cover the liabilities."

96.     Defendant Fortgang had stated at the previous Board meeting that he did not want to question Tompkins' qualifications.

97.     Mr. Barbarosh had informed Defendants at this meeting that Project Verte had total liabilities of over $115 million.

98.     Additionally, Andrew Hulsh, Project Verte's outside counsel, explained to Defendant Fortgang and the rest of the Board that bringing in other advisors was not feasible because advisors work on an exclusive basis.

99.     Project Verte's agreement with Tompkins has an exclusivity clause and was executed when Defendants were on the Board.

100.    Further addressing Defendant Fortgang's suggestion to seek out other advisors, Ms. Gol reminded Defendants that the fulfillment business was initially taken to market to find a capital advisor, but the only two interested companies—G2 and Clark Advisors—both turned down the assignment because it was not an EBITDA sale.

101.    Ms. Gol also stated that senior management spoke to numerous other capital advisors who all said this was a very unique sale: a buyer would be buying into an operation requiring $10-15 million additional capital to make it viable.

102.    The only person who would take on the assignment to market the fulfillment business was Tompkins, and he would only do so on an exclusive basis.

103.    Ms. Gol asked Defendant Fortgang if he had remaining questions with regard to the sales process. He did not.

**Defendants Then Focused on the Technology Business, Ignoring the Need for Action**

104.    Mr. Hulsh reminded Defendants and the rest of the Board that they have fiduciary obligations, particularly given Project Verte's extremely precarious financial position.

105.    Defendants knew this was an urgent, critical situation because (1) they were given extensive documents detailing the dire financial state of the Company the month they joined the Board, (2) they attended multiple Board meetings where management presented on the financial condition of the Company, and (3) they were advised that time was of the essence in selling the fulfillment business given the continuously accruing liabilities.

106.    Defendant Fortgang recognized this as an urgent, critical situation as evidenced by his statement at the previous Board meeting that he understood the focus was on selling the fulfillment business before deciding what to do with the technology business.

107.    However, he asked at this meeting, "how anyone could make a decision on the sale of the fulfillment business without a model or clarity from Mr. Klunk or Mr. Barbarosh as to what the future of the technology business will look like."

108.    Defendant Fortgang then suggested they "wait and understand what will happen with the technology business before the sale of the fulfillment business."

109.    Defendant Kahlon said he wanted to know what was next for the Company in order to decide on the sale of the fulfillment business.

110.    In response, Ms. Gol stated that the Company had no funding to make a future business plan for the technology business absent the sale of the fulfillment business and that Project Verte had two choices: sell the fulfillment business or cease operations.

111.    Defendant Fortgang asked independent director Lev-Aretz what her understanding was of the future of the business.

112.    Ms. Lev-Aretz responded that she understood the Company was working on plans for the future of the technology business, but the urgency was on the sale of the fulfillment business: either they sell the fulfillment business, or "the Company is finished."

113.    With that statement, outside counsel, senior management, and the rest of the Board—including an independent director—agreed that there was an immediate need to sell the fulfillment business.

### <u>Defendants Were Told that They Lacked the Luxury of Time</u>

114.    Mr. Hulsh advised Defendants and the rest of the Board that it was costing more than $50,000 a day just to keep Project Verte operational and that something needed to be done immediately; otherwise, the company faced bankruptcy.

115.    Mr. Hulsh then stated that the Board did not have the luxury of time and needed to make an immediate decision unless someone had another option to fund the Company for a few weeks to vet the fulfillment sale further. No one proposed any other options.

116.    Mr. Hulsh then reminded Defendants and the rest of the Board that, under Delaware law, their obligations are to the shareholders.

117.    Defendant Fortgang acknowledged this, saying in this meeting that, "as a Board member, the obligation is to the shareholders above anyone else."

118.    Later, he said, "the Board has a duty to the investors to maximize value."

119.    Ms. Gol reminded Defendants that (i) the Board had decided unanimously in March 2022 to sell the fulfillment business as soon as possible, (ii) it took a significant amount of time to find anyone to entertain purchasing the fulfillment business, (iii) the potential buyer who was not GPA made an offer contingent on renegotiating all of Project Verte's contracts before it would take assignment, and (iv) GPA had said it would take over the contracts with existing customers.

120.    Ms. Gol asked Defendant Fortgang what else he needed to know to decide whether to sell the fulfillment business or shut down.

121.    Defendant Fortgang responded again that he wanted a clear plan for the technology business going forward and later said they should take more time to decide.

122.    He reiterated that the future of the technology business was important to decide whether to sell the fulfillment business, but independent director Lev-Aretz then responded that if they did not make the decision to sell the warehouse, they would not have the luxury to continue thinking about the technology business.

123.    No vote was held at this meeting.

124.    Just before adjournment, Defendant Fortgang reiterated that he wanted to know about the future of Project Verte.

**At the Next Board Meeting, Defendants Still Refused to Sell**

125.    The Board, including the Defendants, next met on July 20, 2022, when it again discussed the sale of the fulfillment business.

126.    At this meeting, Ms. Gol stated that AJ Group, a shareholder and investor of Project Verte, would provide funding to the Company until the closing of the sale if the sale was approved.

127.    However, because the sale was not yet approved, Ms. Gol asked Defendant Fortgang if he had suggestions for how Project Verte should be funded. He said it was a complicated question and leadership needed to decide.

128.    Management had made its recommendation to the Board that the Board sell the fulfillment business, and the previous iteration of the Board had voted to do so.

129.    Additionally, Ms. Gol stated that based on the lack of funding, management was asking the Board how Project Verte could continue. It was now the Board's decision as to what would happen, and given the lack of funding, it was untenable to continue operating.

130.    Mr. Hulsh told Defendants and the rest of the Board that no decision was also a decision: if they did not approve the sale, that was basically a decision to stop doing business.

131.    Ms. Gol told Defendants that GPA desired to purchase an ongoing business, and even though it knew it would clearly lose money in the near term, a purchase of the business as a going concern was essential.

132.    Ms. Gol stated later in this meeting that GPA had been in business for over 30 years and had its own warehouse management system it would use, so it did not need to use Project Verte's proprietary warehouse management software.

133.    Therefore, Ms. Gol stated that, to the extent GPA's potential use of Project Verte's technology was influencing the Board's vote as a condition, it was not a condition to the sale.

134.    Rather, there were only three open items regarding the sale: (i) how much the broker would get in a commission fee, (ii) whether GPA would use the technology (not a deal-killer as Ms. Gol just explained), and (iii) what percentage of cash would be paid at closing—90% or 100%.

135.     Mr. Hulsh stated at this meeting that if he were a director, he would clearly vote in favor of the sale.

**Defendants Refused to Budge**

136.     Following Mr. Hulsh's comments, Defendant Fortgang said Project Verte was in crisis.

137.     However, Defendant Fortgang also stated that he thought there was nothing that could be produced that would change his mind, that his vote was a firm "no," and that no one should be asked to reconsider.

138.     Ms. Gol responded by saying that this sale was an opportunity that must be taken now, and if not, Project Verte would be forced into bankruptcy.

139.     Another attorney from Mr. Hulsh's firm then advised Defendants and the rest of the Board about their fiduciary obligations, saying it was important for them to understand their duty was to the corporate enterprise and he wanted to make sure they all understood that before casting their vote.

140.     Independent director Lev-Aretz voted to sell the fulfillment business.

141.     Ms. Gol voted to sell.

142.     Defendant Fortgang voted against the sale.

143.     Defendant Kahlon voted against the sale.

144.     The Board was therefore deadlocked.

**Defendants Had Another Chance to Sell but Refused Again**

145.     The Board next met on July 26, 2022 and the Defendants were present.

146.     The minutes from that meeting reflect that Mr. Bullard spoke at length to Defendants and the rest of the Board about Jim Tompkins' qualifications, explaining:

19

- He was a 40-year veteran of the logistics industry;

- He was an international authority on designing and implementing end-to-end supply chains;

- He was a serial entrepreneur who started several businesses, worked with private equity, designed many industrial facilities and automated materials handling systems, implemented many supply chain information technology solutions, and worked to enhance the performance of many third-party logistics companies and their clients;

- His 40+ years as CEO of Tompkins International gave him an insider's view of operators and third-party logistics companies; and

- As a direct result of that experience, he was extremely well connected across the supply chain industry, especially with contacts who were Project Verte's target market for prospective buyers.

147.    Mr. Bullard told Defendants and the rest of the Board that these qualifications, among other things, made Tompkins uniquely qualified to source, vet, and manage the process of identifying the right prospective buyers quickly.

148.    Mr. Bullard reminded Defendants and the rest of the Board that the Company spoke with investment banking firms prior to engaging Tompkins—all of which declined to participate in this non-EBITDA sale of the fulfillment business.

149.    Mr. Bullard informed Defendants and the rest of the Board that GPA was now concerned because Project Verte had not responded to its offer.

150.    He also stated that Project Verte's own employees and vendors were becoming concerned because they were hearing rumors of a sale.

151.    Ms. Gol asked if anyone had any questions. No one did.

152.    Mr. Hulsh then asked if any Board member had questions about the process, whether anyone thought there could have been a better process, and if so, why.

153.    Defendant Kahlon responded that he did not understand the point of the meeting, saying, "nothing you add, nothing you say, nothing you'll do will impact my decision."

20

154.    Defendant Fortgang said that he and Defendant Kahlon already said everything they had to say, had nothing to add, and nothing would change their minds.

155.    Ms. Gol reminded Defendants that (i) the Board brought in Mr. Bullard, a 30-year industry veteran, to the meeting to discuss the sale process; (ii) the Board engaged Tompkins, a 40-year industry veteran to market the sale; and (iii) senior leadership had all reached out to their own contacts about the sale.

156.    Before the end of the meeting, Ms. Gol asked if anyone had questions. No one did.

157.    Ms. Gol asked everyone to send questions before the Board meeting the next day.

### Defendants Did Not Show up to the Next Board Meeting

158.    On July 27, 2022, the Board held a regularly scheduled meeting. It was duly noticed and convened. Defendants, however, did not attend.

159.    Instead, Defendant Fortgang sent an email two hours before the meeting, writing that he could not join due to pain related to recovery from surgery and stating he had "done [his] best to join past emergency meetings."

160.    Defendant Kahlon replied to Defendant Fortgang's email five minutes later, writing, "I too cannot join today for personal reasons."

161.    After waiting 17 minutes beyond the start of the meeting, Ms. Rubenstein emailed Defendants asking them to please dial in. They did not respond.

162.    No quorum was present. The Board could not act due to Defendants' absence.

163.    Ms. Gol mentioned that Defendant Fortgang said he would follow up with questions after the last meeting and that Ms. Rubenstein had emailed him the previous night, but he had not submitted any questions. Neither Defendant submitted any questions.

164.    Ms. Gol, Ms. Lev-Aretz, and another attorney from Mr. Hulsh's firm discussed alternatives to the sale given the deadlocked Board, and they ended the meeting discussing the possibility of appointing a receiver.

### Defendant Fortgang Resigned Three Days Later

165.    On July 30, 2022, Defendant Fortgang resigned from the Board.

166.    During his time on the Board, he had been reminded of his duties to the Company, shareholders, investors, and creditors.

167.    He knew he had these duties as evidenced by his statements from the July 18, 2022 Board meeting that "as a Board member, the obligation is to the shareholders above anyone else" and that "the Board has a duty to the investors to maximize value."

168.    His refusal to sell the fulfillment business did not maximize value and demonstrated a conscious lack of consideration for the best interests of the Company.

### Defendant Kahlon Did Not Show up to the Next Board Meeting

169.    The Board had its next regularly scheduled meeting on August 24, 2022.

170.    Defendant Kahlon was not present when the meeting began. Ms. Rubenstein called his cell phone to ask him to join, but his voicemail was full.

171.    After waiting 15 minutes for Defendant Khalon to call in, he remained absent and never attended this meeting.

### A Receiver Then Tried to Sell the Fulfillment Business, But It Was Too Late

172.    The next day, on August 25, 2022, an Order was entered in the Delaware Court of Chancery appointing Don Beskrone, Esquire, as Receiver for Project Verte.

173.    On September 16, 2022, Mr. Beskrone moved for an Order authorizing the sale of Project Verte's fulfillment business.

174.    On October 11, 2022, a hearing was scheduled to approve the sale of the fulfillment business to GPA.

175.    However, just before the hearing, GPA's attorney sent a letter to Mr. Beskrone that GPA was terminating the Asset Purchase Agreement effective as of this date.

176.    Project Verte therefore did not sell the fulfillment business to GPA, which would have produced $6 million in sale proceeds.

177.    In the end, Project Verte filed for bankruptcy on January 26, 2023.

178.    The fulfillment business was never sold.

## COUNT I – BREACH OF FIDUCIARY DUTY

179.    Plaintiff incorporates paragraphs 1 through 178 of this Complaint by reference and realleges them as if set forth fully herein.

180.    As directors of Project Verte, Defendants were fiduciaries of the Company and each owed it fiduciary duties of loyalty and care.

181.    Related to the duty of loyalty, and a subsidiary element of such duty, is the duty of good faith, which Defendants also each owed Project Verte.

182.    By refusing to approve the sale of the fulfillment business, epitomized by Defendant Kahlon saying, "nothing you add, nothing you say, nothing you'll do will impact my decision," Defendants each intentionally acted with a purpose other than that of advancing the best interests of Project Verte, demonstrating bad faith and a breach of the fiduciary duties of good faith and loyalty they each owed Project Verte.

183.    By refusing to approve the sale of the fulfillment business—even though they knew Project Verte needed the sale to continue as an operation and that there were no other viable options—Defendants each intentionally refused to act in the face of a known duty, demonstrating

bad faith and a conscious disregard for the duties they each owed to the Company, thus breaching the fiduciary duties of good faith and loyalty they each owed to Project Verte.

184.     By refusing to approve the sale and failing to attend regularly scheduled Board meetings, including doing so after Defendant Fortgang admitted that the Company was in "crisis," Defendants each acted in bad faith and breached their fiduciary duties of good faith and, by extension, loyalty.

185.     Project Verte has suffered monetary harm due to Defendants' breaches in an amount not less than $5 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     finding Defendants each breached the fiduciary duties of good faith and loyalty they owed Project Verte;

B.     awarding Plaintiff actual, compensatory, consequential, and other damages sustained by Project Verte as a result of each Defendant's breaches of fiduciary duties;

C.     awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.     granting such other and further relief as deemed just and proper.

*(signature page follows)*

Dated: August 9, 2023

Respectfully submitted,

**FOX ROTHSCHILD LLP**

By: /s/ Seth A.Niederman
Seth A. Niederman, Esquire
Delaware Bar No. 4588
919 North Market Street, Suite 300
P.O. Box 2323
Wilmington, DE 19899-2323
Phone: (302) 654-7444
Fax: (302) 656-8920
sniederman@foxrothschild.com

-and-

Michael G. Menkowitz, Esquire
Jesse M. Harris, Esquire
2000 Market Street, 20th Floor
Philadelphia, PA 19103-3222
Phone (215) 299-2150
Fax (215) 299-2150
mmenkowitz@foxrothschild.com
jesseharris@foxrothschild.com

*Counsel for Alfred T. Giuliano,
Plaintiff and Chapter 7 Trustee for the
estate of Project Verte Inc.*